By the Court :

Jones, J.
When no time is specified for the performance of a contract, its legal effect is that the parties have contracted for its performance in a reasonable time.
What the reasonable time thus contracted for is, must be determined upon a consideration of all those facts which both parties had in view in making the contract.
There are some general rules which have a controlling influence in determining what this reasonable time is in those cases where they are applicable. Thus, one is presumed not to require more than a business day to pay a sum of money which he has contracted to payso one who sells an article is presumed to have it on hand, ready for delivery; so, again, one who contracts to perform an act within a reasonable time is presumed to have the means at hand for immediately proceeding on its performance.
Evidence showing the existence of facts known, or presumed to be known, to both parties, and that the parties contracted in reference thereto, will modify these rules in accordance with said facts; but unless so modified, the parties will be presumed to have contracted in reference to these rules.
To apply these rules to the present case : The contract was made on the 17th November, 1864, in the city of New York, and *95 was to ship, at Baltimore or Georgetown, two cargoes of coal to New Haven, at $6.25 per ton at Baltimore or Georgetown. Hnder this contract the defendants, according to the above rules, must be presumed to have had on hand, ready for shipment, the requisite amount of coal, and to have had facilities for immediately commencing the shipment.
Only so much time, then, can be allowed them for the performance of their contract as was requisite to send notice of the contract to Baltimore or Georgetown, and to complete a shipment of coal on hand at either of those places, commenced immediately on the receipt of said notice at said places.
It would perhaps be superfluous to require proof to show that a month would be an unreasonable time to take for performing these acts.
But there is evidence showing that four and a half cargoes can be shipped per month (fol. 78); that four cargoes had been shipped in December, 1864, one of them to New Haven ; and thus establishing, under the above rules, that the reasonable time within which the contract should have been performed expired at least as early as December 17, 1864.
It is, however, insisted that there is evidence showing facts modifying the above rules and extending the time for performance. The facts thus relied on are: (1) obstruction of the railroad by freshets; (2) raids by rebel forces obstructing the railroad; (3) delay of the railroad in delivering the coal, and its appropriation to its own use of a considerable quantity of the coal they should have delivered.
None of these matters were shown to have been mentioned at the time the contract was entered into, nor is it shown that at that time they were known to the plaintiff, or its agent, nor can the plaintiff or its agent be presumed to have known them.
The contract therefore was not entered into with reference to any of these matters; and they cannot therefore.be considered in determining the question as to what should be deemed a reasonable time for its performance (Ellis v. Thompson, 3 Mees. & *96 Weld., 445; Farmers’ Loan, and Trust Co. v. Hane, 16 Barb., cited, p. 521).
The common-carrier cases cited by respondent’s counsel do not conflict with the foregoing views. They hold that where no time is specified within which transportation is to be made, the contract of the carrier is to transport with reasonable diligence. Of course such a contract is not broken if a delay occur not within power of the carrier to control, because such a delay does not show a want of reasonable diligence.
The case of Wibert v. Erie Railroad Company (12 N. Y., 251) does not maintain the doctrine that the fact of the delay being occasioned by an accumulation of previously received freight, will excuse the carriers in cases not falling within the statute mentioned in the opinion, or within the principle of that statute.
Whether in other cases such fact would be an excuse may be regarded as not yet determined in this State, and it is unnecessary now to determine it.
In the demurrage case the Court held that where there was no express contract as to the time in which the vessel should discharge cargo, the law would imply a contract to discharge her in the usual and customary time for unloading such cargo ; that such .custom required the vessel to await her turn; and that, as the defendant in the case- then on argument was the owner of the dock, and there was an unusual accumulation of vessels at his dock with cargoes for himself, he should be allowed to show that such accumulation was without his fault, and consequent upon risks to which navigation is frequently exposed. Indeed, the opinion seems to indicate that it would lie in the plaintiff to show that the accumulation was by fault of the defendant (Cross v. Beard, 26 N. Y., 85).
The case of Cocker v. Franklin County (3 Sumn., 530) is a report of a nisi prius trial had in a sister State.
Assuming the charge of the learned Judge in that case to lay down a doctrine opposed to that of the charge in this case, still it would not be an authority to control our decision in its favor as against the charge under review. It possesses no greater *97 weight than the present charge. The fact that it is prior in point of time, and is printed in a volume of reports, does not invest it with any greater weight.
But it does not lay down any different doctrine. It is true there are contained in the charge some general expressions which, taken by themselves, would give color to the respondent’s propositions. But these remarks immediately follow the citation of the case of Ellis v. Thompson (3 Mees. & Weld., 445). And the instruction given to the jury of the doctrine established by that case, viz., that the question of reasonable time was to be determined by a consideration of those facts bearing on it which were proved, or presumed by law, to be known to both contracting parties. Then these general remarks follow, instructing the jury what facts, if known to both parties, would bear on the question of reasonable time.
Taking the whole charge together, this is the correct exposition of the meaning of the general expressions in question ; and in this respect the.charge does not militate against the doctrine advanced in this opinion.
The other cases cited need no especial reference. They contain no doctrine at variance with the above views.
But it is further urged that the freshet was the act of God ; and, as I understand it, that consequently the time 'within which the contract should otherwise be performed was thereby extended ; and the case of Wolfe v. Howe (20 N. Y., 197) is cited. Under the legal signification of the term “ act of God ” (Niblo v. Binnse, 44 Barb., cited, p. 62) a freshet may well be considered as an act of God.
An act of God, however, does not change the contract between the parties ; but when it renders performance impossible it affords an excuse for non-performance. To entitle a defendant to the benefit of such excuse he must plead it as an affirmative defence. This the defendant in the present ease has omitted to do.
But further than this: the only freshet complained of occurred in the spring of 1864, long before the contract in question was *98 entered into, and then caused an interruption of but ten days (fob 114). There is no evidence tending to show that this freshet interfered with the delivery of the coal, otherwise than by causing a deficiency of supply to meet the contracts then on hand, and consequently to delay their execution, and by reason thereof the execution of others coming after them. This is too remote to have any effect on the present contract. A defendant cannot be allowed to evade the requirements of his contract by seeking for an excuse for delay in its execution at such a remote period of time prior to the making of the contract. Besides, the defendants must have known of the effect of this freshet at the time they made the contract, while the plaintiff was in ignorance of it; and they must be deemed to have made the contract to ship in a reasonable time, without any reference to the effect of the freshet.
There was considerable evidence on the subject of scarcity of vessels to receive shipments of coal. However that fact may be, it cannot, for the reasons given in respect to the raids,, be considered in determining the question of reasonable time..
Other of the appellants’ points raise the question whether shipment and payment were not to be concurrent acts, and to be performed simultaneously.
I think shipment was to precede payment.
The contract called for a shipment by defendants to plaintiff at Philadelphia. This shows that it was not in the contemplation of the parties that plaintiff should be at either Baltimore or Georgetown to receive the coal; if it was not contemplated that he should be there to receive; it could not have been contemplated that he should be there to pay or receipt. Shipment and payment, then, were not to be concurrent acts. Payment was not to be a precedent act, for the whole evidence shows that the non-shipment was never sought to be excused on the ground that precedent payment had not been made.
It follows, as the proof is clear that no shipment was ever made, and no valid excuse is shown for not making it, that defendants are liable for the breach of the contract with *99 out any tender or offer on plaintiff’s part (Morris v. Sliter, 1 Denio, 59).
This view disposes of the second, third, fourth, fifth, and sixth points, except so much of point six as refers to defendant’s continued willingness to perform.
Upon these principles, the clear and uncontradicted evidence shows that the reasonable time for the performance of the contract by the defendants expired at least as early as the 15tli of December, 1864, and at that time a breach of their contract on the part of the defendants.
This necessarily disposes of the objection arising out of plaintiff’s offer to furnish vessels to receive the cargoes, and the limit as to the rate to be paid for carrying the freight placed by it on the ship brokers it employed; for these matters, occurring after breach, were not sufficient to constitute a waiver thereof, or to relieve the defendants from their liability already accrued.
But there are further reasons why this offer and limit cannot defeat plaintiff’s recovery.
The offer to furnish vessels was voluntary and without consideration, and therefore could not operate to change the rights of the parties under the contract. Nor will an offer or endeavor by one party to the contract to aid the other in performing his contract, and thus speed its fulfilment, absolve the other from performance.
If both parties regard the offer as giving to the one the exclusive charge of providing something which the other was bound to provide, and they so act upon it, this would form an excuse for a delay in performance occasioned by a non-provision of the thing to be furnished.
Such offer, however, might at any time be withdrawn, and then the parties would be remitted to their rights under the contract, with such excuse for intermediate delay as might be furnished by the existence of the offer.
But in this case the parties did not regard the offer as one which gave the exclusive charge of procuring a vessel to the plaintiff, nor did they act on it as such. The defendant’s ship *100 ping agent swears that he told the ship brokers employed by plaintiff that he would procure a vessel himself if he could (fol. 112). Again, he says, “ I offered to ship up to two hundred and fifty tons whenever I could ship the coal with certainty and Bose & Lyon or myself could find a vessel of suitable character ” (fol. 119).
The offer was simply to aid in finding a vessel, and was so understood by the parties, and, consequently, did not relieve defendants of their obligation to ship in a reasonable time.
Further, defendants’ shipping agent placed restrictions on the ship brokers as to the character of the vessel to be furnished. This, except on the basis that the offer was a mere voluntary one of assistance, he had no right to do, and so the placing of such restrictions destroyed the effect of the offer.
Again, the shipping agent, not being then able to furnish the coal, undertook to notify the ship brokers at the earliest moment when he could furnish the coal (fol. 112). He never gave any such notification, therefore the non-shipment is to be ascribed rather to the absence of coal than to the non-providing a vessel.
The limit as to the rate to be paid by the ship brokers for carrying the freight was imposed by the plaintiff on its agents to govern their action. It did not assume to act on the obligation of the defendants.
Their obligation was to ship at the ruling rates. A limitation not addressed to them, but to a third party, wholly unconnected with and acting independently of them, for his guidance, cannot affect their obligation.
This disposes of so much of the sixth point not before disposed of; also of the first, second, and third subdivisions of point seven;. also-of the second and third subdivisions of point ten.
The testimony of Small as to the price of coal at Baltimore was properly admitted; although he made no sales himself personally, yet his testimony shows that he had knowledge, from being on the spot and being cognizant of sales made by others.
This disposes of the eighth point.
The discrepancy between the evidence of Small and that of *101 Lyon as to the size of cargo which Small offered to furnish, was, in the views above taken, wholly immaterial, and consequently any erroneous assumption on that point would not call for a reversal; and, for the same reason, the exclusion of the letter of Rose & Lyon, even if erroneous, does not affect the judgment. The same remark applies to the point respecting the demand of Teamans prior to November.
It is also said that plaintiffs sought to obtain a larger cargo than they were entitled to. I find no evidence sustaining this. They were entitled to two cargoes of two hundred and fifty tons each. I do not perceive .that they ever sought to obtain more than five hundred tons. Certainly after the great delay in furnishing the coal they were entitled to have as much of five hundred tons loaded in one vessel as the draft of water at the dock where the coal was to be furnished, and the accommodation of the dock, would permit. This disposes of all the seventh point not before disposed of, and also of the first subdivision of the tenth. As to the charge, at folio 175, leaving it to the jury to determine whether the evidence of Quintard did not show a refusal to perform, I think the charge was more favorable to the defendant than he had a right to.
Quintard’s testimony is that he informed the plaintiff’s agent, Avhen the offer and demand were made by him, that the coal was ready at any time when plaintiff would send a vessel for it, or the defendants could get one to send it.
Such were not the teams of the contract. The contract was for a shipment within a a-easonable time. It is held above that what is a reasonable time does not depend on the difficulty of procuring vessels; that by the conta’act defendants undertook to have the means for shipment on hand ready to commence the shipment as soon as the order could in due time be transmitted to their agent. The offer, then, to pea-form upon conditions not provided for by the contract was a a-efusal to perform aceordhag to its requia-ements. Again, it is above held that befoa-e this offer was made a ba-eaeh of the contract had occura-ed; an offer to perform after breach will not relieve from liability therefoa-.
*102 This disposes of all of the tenth point not before disposed of.
Under the law as settled by this Court, the written offer of April 23,1864, signed by the defendants, and the letter of November 17,1864, signed by plaintiff’s agent, referring to the offer of April 23, and treating it as a subsisting contract, constituted a valid contract under the Statute of Frauds.
Another objection urged, is that the agreement was not properly stamped under the United States stamp act.
The stamp act applicable to this case is that of June 30, 1864, which took effect August, 1864, and the point arises under the' 158th section of that act, which is as follows :
“ Sec. 158. And be it further enacted, that any person or persons who shall make, sign, or issue, or who shall cause to be ‘1 - ,¡ made, signed, or issued, any instrument, document, or paper of any kind,or description whatsoever, or shall accept or pay, or cause to be accepted or paid, any bill of exchange, draft or order, or promissory note for the payment of money, without the same being duly stamped or having thereon an adhesive stamp for denoting the duty chargeable thereon, with intent to evade the provisions of this aet, shall, for every such offence, forfeit the sum of two hundred dollars; and such instrument, document, or paper, bill, draft or order, or note, shall be deemed invalid and of no effect.”
The point is not well taken, for two reasons:
1. There is no evidence that the omission to affix the proper stamp was with intent to evade the provisions of the aet. It is necessary that the omission should be with such intent m order to invalidate the instrument; and the burden of proving such intent lies in the party seeking to invalidate the defendant in this case.
2. Even if the burden of proof was upon the plaintiff, yet the defendant cannot now take advantage of the defect of" proof; for on his motion for a nonsuit he did not call the attention of. the plaintiff to such defect. If he had, it might have been supplied. He claimed-, on the motion for a nonsuit, that-the bare *103 omission of the stamp of itself invalidated the agreement. This was his only claim, and in this he was in error.
This disposes of the first point.
But I think the ninth point is well taken, and the rule of damages adopted was erroneous. The proper rule is the difference between the contract price and the market price on the day of breach. This contract did not become valid and binding until November 17,1864; until that day there was no legal obligation on the defendants to perform. The reasonable time within which they should perform must date from the day on which they first became liable to perform. Plaintiff was allowed to recover at a rate which ruled prior to the contract becoming binding, which was higher than that which ruled afterward. From the time the contract became binding down to a date long subsequent to the breach, the market rate had remained uniform a $10.50 per ton (fol. 60).
The judgment should be reduced by deducting $250, with interest thereon.
If the plaintiff consent to make such reduction, the judgment is affirmed without costs of appeal to either party. If he refuse, judgment is reversed, and anew trial is ordered, with costs of appeal to the appellant to abide the event.